UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAURIETTA AMARA,

    *Plaintiff*,

v.

DAVID STEINER, Postmaster General,
United States Postal Service,

    *Defendant*.

Civil Action No. 23-cv-03423 (CJN)

**MEMORANDUM OPINION**

In 2019, Plaintiff Maurietta Amara was offered a job as a City Carrier Assistant with the United States Postal Service. Shortly after her training began, the agency discovered she was not properly onboarded and discontinued her training. Amara claims here that these actions constituted unlawful disability discrimination. *See generally* ECF No. 1 (Compl.). Both parties move for summary judgment; for the reasons explained below, the Court denies Amara's motion and grants the agency's.

**I.  Background**

Amara was initially employed by the Postal Service beginning in 1998. Compl. ¶ 15. By 2007, she was working at the Processing and Distribution Center in Tampa, Florida. *Id.* ¶ 16. Two years later, the Office of Workers' Compensation Programs accepted her claim that she had developed an aggravated depressive disorder as a result of suffering workplace harassment and placed her on workers' compensation. *Id.* ¶¶ 17–18.

After ten years of receiving benefits, the Postal Service required Amara to participate in a work rehabilitation program, which she promptly complied with. *Id.* ¶ 19. Amara was assigned

1

to a vocational counselor, *id.*; *see* ECF No. 67, Ex. L, and in early July 2019, applied to work for the Postal Service again by filling out and submitting the standard application located on its website. *See generally* ECF No. 84-2; *id.* at 8. When Amara applied, she was still receiving workers' compensation benefits, but she did not disclose that information to the Postal Service. ECF No. 84-1 (Hunter Decl.) ¶ 5; *see generally* ECF No. 84-2.

On October 3, 2019, the Postal Service extended Amara an offer to be a City Carrier Assistant at its Brentwood Road location in Washington, DC. Compl. ¶ 20; ECF No. 67, Ex. D. From October 15 through October 17, 2019, Amara attended training and orientation. ECF No. 67, Ex. C. On the second day of training, the Postal Service discovered that Amara was still receiving workers' compensation benefits, ECF No. 67, Ex. H, and discontinued her training two days later, *id.*, Ex. L; *see* Compl. ¶ 24. Shortly thereafter, the vocational counselor spoke with a Postal Service human resources specialist, who indicated that she was trying to determine the correct process for hiring Amara. *See* ECF No. 67, Ex. L. The human resources specialist stated that she could not follow the agency's typical onboarding procedures because Amara was still receiving workers' compensation benefits. *See id.*; Hunter Decl. ¶ 7.

As it turns out, hiring (really, rehiring) a former Postal Service employee receiving workers' compensation benefits is a unique and distinct process from hiring a new employee. Hunter Decl. ¶ 7. Among other things, for example, the agency's Employee Labor Manual instructs that employees who fully overcome an injury or disability more than one year after their workers' compensation begins shall be given priority consideration for reassignment or reemployment into their former position or an equivalent one. *Id.* ¶¶ 6, 8 (citing Section 546.131, Reassignment or Reemployment of Employees Injured on Duty, https://about.usps.com/manuals/elm/html/elmc5_034.htm (last accessed February 9, 2026)). Also,

an appointing official determines whether to make a reassignment or reemployment offer only after receiving and evaluating a referral from the Office of Workers' Compensation Programs that includes documented medical limitations and recommendations from the postal physician or occupational health nurse administrator. Section 546.631, Reassignment or Reemployment of Employees Injured on Duty, https://about.usps.com/manuals/elm/html/elmc5_034.htm (last accessed February 9, 2026).

The record is not entirely clear as to what transpired after Amara's training was discontinued. *See* ECF No. 67, Exs. A–M. By mid-November, Kay Hunter, a human resources manager, emailed other employees that she was "not in support for hiring [Amara]." *Id.*, Ex. K. In the weeks that followed, human resources personnel discussed whether and how the agency might pay Amara for the days she attended orientation. *See id.* Despite those discussions, the record does not reflect that Amara was ever fully onboarded or paid by the Postal Service. *See id.*; *see also id.,* Ex. L.

After pursuing administrative remedies without success, *see* Compl. ¶¶ 8–12, Amara filed this action, alleging age discrimination under the ADEA and disability discrimination and retaliation under the Rehabilitation Act, *see generally id.* The Court previously dismissed her ADEA and retaliation claims. ECF No. 12. The parties now cross-move for summary judgment on Amara's only remaining claim: disability discrimination under the Rehabilitation Act. ECF No. 67; ECF No. 84.

## II.     Legal Standard

To prevail on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "genuine" if the evidence is such that "a

3

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it could "affect the outcome of the suit under the governing law." *Id.* at 247–48.  If the movant meets its burden of showing that no genuine dispute of material fact exits, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), the nonmoving party must then come forward with "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.  In deciding a motion for summary judgment, the Court evaluates the record evidence and draws all reasonable inferences "in the light most favorable to the nonmoving party."  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (citing *Anderson*, 477 U.S. at 255).[1]

### III.   Analysis

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may "be subjected to discrimination" by a federal agency "solely by reason of her . . . disability." 29 U.S.C. § 794(a).  Discrimination claims under the Rehabilitation Act are subject to the burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  *See Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 16–17 (D.C. Cir. 2009).  Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing that she suffered an adverse employment action because of her disability.  *Id.* at 17; *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–253 (1981); *see Baloch v. Kempthorne*, 550 F.3d 1191,

---

[1] Amara asserts that the sworn declaration of Kay Hunter (who, again, was a human resources manager in 2019) should be disregarded because it is "a litigation-driven attempt to manufacture a defense after extensive evidence had already been submitted." ECF No. 89 at 5–6.  But courts only disregard an "affidavit that is submitted to withstand a motion for summary judgment when the affidavit contradicts prior deposition testimony without adequate explanation and creates only a sham issue of material fact." *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 573 F. Supp. 2d 152, 160 (D.D.C. 2008), *aff'd sub nom. Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217 (D.C. Cir. 2011) (internal quotation marks omitted).  Because Hunter has not previously been deposed, nor made any other statements under oath, her declaration does not create "only a sham issue of material fact" and therefore should be considered.  *See id.*

4

1196 (D.C. Cir. 2008) ("[T]he two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . disability."). Once the plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence of "a legitimate, nondiscriminatory reason" for its action. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). If the employer does so, "the burden shifts back to the plaintiff to prove that the [employer's] proffered reason is pretextual." *Cong. v. Gruenberg*, 643 F. Supp. 3d 203, 229 (D.D.C. 2022) (citing *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014)).

This burden-shifting framework is simplified when an employer has moved for summary judgment and proffered a legitimate, non-discriminatory explanation for the alleged adverse employment action. *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008).[2] In such cases, the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonell Douglas*." *Id.* at 494. Instead, the Court "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of" disability? *Id.* at 494. If the employee "is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [the employer's] proffered reason was a pretext for discrimination, summary judgment must be entered against" the employee. *Paquin v. Fed. Nat. Mortg. Ass'n*, 119 F.3d 23 (D.C. Cir. 1997).

---

[2] Although *Brady* delt with a Title VII claim, the "simplified *McDonnell Douglas* framework" announced in that case also applies to "discrimination claims brought under the Rehabilitation Act." *Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 259 (D.D.C. 2017).

Here, the Postal Service asserts a legitimate, non-discriminatory reason for discontinuing Amara's training[3]: because she was a former employee receiving workers' compensation benefits, the agency could not onboard her through its standard procedures. ECF No. 84 at 4. Instead, as stated in the Hunter declaration, the Postal Service has different procedures for former employees with job-related disabilities who are receiving workers' compensation benefits. *See* Hunter Decl. ¶ 6. For example, as noted above, a former employee who fully overcomes a disability more than one year after beginning to receive compensation is entitled to priority consideration for reassignment or reemployment. *Id.* ¶ 8; *see* 5 U.S.C. § 8151(b)(2). As also noted above, an appointing official determines whether to make a reassignment or reemployment offer only after receiving and evaluating a referral from the Office of Workers' Compensation Programs containing documented medical limitations and the recommendations of the postal physician or occupational health nurse administrator. *See* Section 546.631, Reassignment or Reemployment of Employees Inured on Duty, https://about.usps.com/manuals/elm/html/elmc5_034.htm (last accessed February 9, 2026).[4]

It is undisputed that when Amara applied for the City Carrier position, she was still receiving workers' compensation benefits for a job-related disability that began in 2009, but did not disclose that fact during the application or onboarding process. *Id.* ¶ 5; *see also* ECF No. 67,

---

[3] The parties use imprecise terminology to describe Amara's employment status. Both assert that she was "hired" and later "terminated" or "separated." But the record appears to suggest that Amara was not fully onboarded and that her training was discontinued. In any event, these distinctions are immaterial because it is undisputed that Amara was subject to an adverse employment action in October 2019 (whether it is described as a termination, a separation, or a discontinuation of the training).

[4] The Court takes judicial notice of information on official public websites of government agencies. *Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33–34 (D.D.C. 2014).

Ex. K.  It is also undisputed that the Postal Service's hiring personnel did not learn of Amara's status until October 16, 2019, while she was in the middle of orientation and training.  *See* ECF No. 67, Exs. H, L.  Because they are were unaware of Amara's status at the time of her application and onboarding, those personnel did not initially follow the required procedures for hiring former employees receiving workers' compensation benefits; and when they became aware of her status, they discontinued her training.  *See* Hunter Decl. ¶ 10; ECF No. 67, Ex. L.

Because the Postal Service has proffered a legitimate, non-discriminatory reason for its action, the Court "turn[s] directly to the central issue: whether [the employee has] produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated against [the employee] based on" her disability.  *Brady*, 520 F.3d at 495.  In this case, Amara has not produced sufficient evidence to establish that the Postal Service's asserted reason was pretextual and that disability discrimination "was the real reason for her termination."  *See Doak v. Johnson*, 19 F. Supp. 3d 259, 273 (D.D.C. 2014), *aff'd*, 798 F.3d 1096 (D.C. Cir. 2015).

Amara relies primarily on a November 29, 2019 email in which Hunter stated that she did not support hiring Amara.  Amara contends that this communication reflects that her disability was a motivating factor in the decision to discontinue her training.  ECF No. 67 at 4.  But the email does not mention Amara's disability, and nothing in the surrounding correspondence suggests that Hunter's position was based on discriminatory animus.  *See id.*, Ex. K.  To be sure, a separate email in the chain noted that Amara had "been on [Office of Workers' Compensation Programs] periodic rolls since 2009," but that message was sent *after* Ms. Hunter expressed her opposition to hiring Amara.  *Id.*

Amara advances additional arguments to establish pretext. She contends that the Postal Service's stated reason for discontinuing her training is illegitimate because the agency allegedly knew that she was receiving workers' compensation benefits before offering her a job. ECF No 89 at 2–4 (citing ECF No. 67, Exs. B-1, B-2, H, I, L). But the record does not support that assertion. The letter from the Department of Labor informing Amara of her disability benefits was neither addressed to nor shown to have been received by Postal Service hiring personnel. *See* ECF No. 67, Exs. B-1, B-2. The email acknowledging the Postal Service's discovery of Amara's status was sent on November 1, 2019—weeks after Amara's training was discontinued. *Id.*, Ex. L. And all of the relevant email communications regarding the fact that Amara was receiving workers' compensation were sent between October 16, 2019, and March 3, 2020—dates after her onboarding began. *Id.*, Exs. H, I, K. None of this evidence demonstrates that those responsible for hiring Amara knew of her status prior to her being offered a position or starting the onboarding process. *Id.*, Ex. D. To the contrary, the record indicates that the agency discovered that Amara was receiving workers' compensation benefits only after she reported for training. *See id.*, Ex. L (email stating that "[Amara] reported for training as instructed and[,] *upon arrival*, [the Postal Service] learned she was on OWCP." (emphasis added)); Hunter Decl. ¶¶ 5, 10 (stating that Amara had not indicated that she was receiving disability payments when she applied to the Postal Service).

Amara next argues that the agency's stated reason for its action was pretextual because it knew she was receiving workers' compensation, and therefore knew about her disability, before discontinuing her training. ECF No. 89 at 3. But the agency's knowledge of that fact, without more, does not show that its proffered non-discriminatory rationale is a pretext for discrimination. The Postal Service has explained that it discontinued Amara's training after learning that she was

8

still receiving workers' compensation benefits and that required hiring procedures had not been followed.  Amara offers no evidence that this explanation is false, nor does she point to anything in the record that suggests that discrimination, rather than a failure to properly onboard her, was the real reason for discontinuing the training.

Finally, Amara argues that the Postal Service's allegedly inconsistent statements about her employment status demonstrate pretext.  ECF No. 89 at 3–4.  It is true that "the falsity of [an] employer's explanation" can be "probative of intentional discrimination."  *Reeves*, 530 U.S. at 147.  But Amara has not identified any such inconsistency here.  *See* Hunter Decl. ¶ 4; ECF No. 67, Exs. J-1, J-2; ECF No. 42.  She points to the Postal Service's representation in a Joint Status Report that it had "no official record of Ms. Amara's employment or termination, as she was not successfully onboarded," ECF No. 42 at 2, and contrasts that statement with her employment application, employee badge, and an email scheduling her for processing on October 3, 2019, ECF No. 67, Exs. D, E, F.  *See* ECF No. 89 at 4.  In her view, these materials contradict the agency's prior assertion that there was no record of her employment.  The cited documents, however, show only that Amara had started the onboarding process; they do not establish that she was successfully onboarded or placed on the payroll.

In sum, the Postal Service has proffered a legitimate, non-discriminatory reason for ending Amara's training:  she was not being properly onboarded because she was a former employee receiving workers' compensation benefits.  Amara has produced no evidence from which a reasonable jury could conclude that this explanation is false or masks discriminatory intent.  To the contrary, she has offered evidence that reinforces the agency's stated rationale.  *See, e.g.*, ECF No. 67, Ex. L (email from her vocational counselor mentioning the agency's efforts to determine the proper process for hiring Amara "given her current status.").  On this record, no reasonable

9

jury could find that "the [Postal Service's] asserted non-discriminatory reason was not the actual reason" for its decision to discontinue Amara's training. *Brady*, 520 F.3d at 495.

## IV.    Conclusion

For the foregoing reasons, the Court denies Amara's motion for summary judgment and grants the agency's cross-motion for summary judgment. A separate Order will accompany this Memorandum Opinion.

DATE:  February 13, 2026

CARL J. NICHOLS
United States District Judge